**FILED**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

00 FEB -7 AM 11: 34

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| VALERIE B. STOREY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. CV-98-S-1078-NE |
| | ) |
| TELEDYNE BROWN ENGINEERING | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ENTERED**

FEB -7 2000

## MEMORANDUM OPINION

Plaintiff, Valerie B. Storey, initiated this action against Teledyne Brown Engineering Company ("TBE"), her former employer, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* She asserts two claims: she was sexually harassed by her supervisor, Greg Hambright ("Hambright"); and she was discharged in retaliation for reporting Hambright's discriminatory conduct.

The action is before the court on several motions: (1) TBE's motion for summary judgment (doc. no. 52); (2) TBE's motion to strike plaintiff's affidavit (doc. no. 63); (3) TBE's motion for leave to file a reply brief and additional affidavit in support of its motion for summary judgment (doc. no. 64); and (4) plaintiff's motion to strike TBE's reply brief (doc. no. 70). After consideration of the briefs of counsel, the relevant law, and the

record as a whole, the court finds that TBE's motions for summary judgment and to strike are due to be granted, and plaintiff's claims dismissed in their entirety. All remaining motions are due to be denied as moot.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.,* 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without

2

supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should

3

not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II.   FACTUAL BACKGROUND

Plaintiff was hired by TBE as a data operator on May 11, 1988. (Plaintiff's deposition at 37.)    Over the subsequent course of her eight-year period of employment, plaintiff transferred and was promoted to various positions and departments within TBE. (*Id.* at 52-55.)    Her last assignment began in June of 1994, when she transferred to the position of marketing representative for the Electro-Optical Products Team. (*Id.*; Yanosky's affidavit ¶ 2.)

The Electro-Optical Products Team ("EOPT") was a unit organized under TBE's hardware strategic systems business division ("hardware systems"). (Plaintiff's deposition at 54-55; Thurston's affidavit

4

¶¶ 2.)   The EOPT:

> was established to transition some of TBE's technology (i.e.
> optics) into commercial products for sale by TBE.    The
> primary product that the EOPT was working to develop was the
> Laser Diode Collimator Corrector ("LDCC").    This was a
> device to improve, through optics, the power density and
> efficiency of laser emitting diodes.  The EOPT was working
> on a plastic commercial application of the LDCC that would
> sell for around $100.00.  The commercial version of the LDCC
> was never developed by the EOPT.

(Thurston's affidavit ¶ 2.)

Plaintiff's primary responsibility as the principal marketing

representative for the EOPT was to prepare a marketing and sales

strategy for the LDCC.  (Plaintiff's deposition at 58-59, 61.)  As

part of her marketing responsibilities, plaintiff organized and

attended trade shows, and publicized the LDCC through the general

media.   (Id.)

Plaintiff's immediate supervisor was Paul Fileger, the leader

of the EOPT team.   (Thurston's affidavit ¶ 3.)  Fileger, in turn,

reported to Bruce Thurston, the manager of TBE's hardware strategic

systems, a business division.  (Id.)  Under Fileger's leadership,

however, the EOPT experienced "budgetary shortages":

> [T]he EOPT was suffering budget shortages because they were
> failing to meet the business plan it had established.    If
> the budgetary problems were not controlled, funding of the
> EOPT was going to expire by the Summer of 1996.
> Specifically, the LDCC was projected to be commercially
> viable by January 1996, but at that time[,] the EOPT had not

5

successfully developed a commercially marketable LDCC.

(*Id.*)

In January 1996, Thurston hired Greg Hambright to become the new manager of the optical products group, thereby putting him in charge of the EOPT, and replacing John Yanosky, the previous manager. (*Id.*; Yanosky's affidavit ¶ 1.)

The EOPT, under Paul Fileger, was focusing primarily, if not solely, on the technology of the LDCC and ignoring the business and market considerations as well as the internal budgets. ... This caused me to hire Greg Hambright as the Leader of the EOPT. At that time, Greg was working for another division of TBE in California and I had met him on another project. Greg started work in January of 1996, and one of the first things I asked him to do was prepare a budget and business plan for the EOPT, and assess the critical staffing needs of the EOPT.

(Thurston's affidavit ¶¶ 3-4.)

Immediately after Hambright acquired his new position, plaintiff, along with fourteen other EOPT employees, composed and signed a petition to Thurston and Jim McGovern, the President of TBE, requesting that Hambright be removed from his newly-acquired position. (Defendant's exhibit 7.) In pertinent part, that letter, dated January 10, 1996, reads as follows:

Events have occurred that compel us to write to you directly. The Electro-Optical Products Team ... believes that our message and our successes have not been accurately conveyed to you....

6

At a critical juncture in our activities, Greg Hambright was appointed as the Optical Products Manager to act as a facilitator for the group to remove obstacles and fix internal procedures to allow us to concentrate on the job of selling diffractive optics. It has become apparent thorough conversations with Mr. Hambright and through his actions, that his intention is not to act as the facilitator but as the leader of this group, a position ably filled solely by Paul Fileger. If Mr. Fileger is indeed being replaced by Mr. Hambright[,] then the group's success is at risk because Mr. Hambright can not be expected to come up to speed quickly enough to take over those responsibilities and be a benefit to our business during this crucial time. If Mr. Fileger is to remain the manager of the group, then another management level between Paul Fileger and Bruce Thurston serves no immediate purpose and only increases the potential for distortion or omission of vital information.

<u>Therefore, we do not feel that the Optical Products Manager position (formerly occupied by John Yanosky and currently filled by Greg Hambright) provides any added value to our team and we feel that the position should be eliminated. Paul Fileger is the only manager this group needs.</u> He has demonstrated through his actions that he has the skill, knowledge, and technical expertise to lead this group and meet the goals set to measure our success. Mr. Fileger has earned our respect and trust and as such, the loss of Paul will adversely effect morale and our faith in TBE to support this effort. Any additional support (financial, sales, or marketing) should be provided in an advisory capacity to support Mr. Fileger and the team, not as another management layer. We are strongly committed to this business and believe passionately that it will succeed if Mr. Fileger is allowed to report to Bruce Thurston directly.

(*Id.* (emphasis supplied).) Plaintiff candidly admits that she did

not like Hambright (Plaintiff's deposition at 95), and, that she

did not "readily consent to his leadership." (*Id.* at 135.)

Prior to Hambright's employment with the EOPT team, plaintiff's

7

previous supervisors, namely Yanosky and Fileger, allowed her to
work a flexible schedule.

> Paul Fileger and I did give plaintiff permission to work odd
> hours and unusual times to accommodate her personal
> circumstances involving child custody and her divorce. She
> was also ill quite often. At the time, Paul Fileger told me
> allowing plaintiff to do this would not impact the operation
> of his group.

(Yanosky's affidavit ¶ 4.) Hambright, however, sent a memo to the
entire EOPT team, requesting that all employees work a fixed
schedule.   (Plaintiff's deposition at 94-96.)   Plaintiff admits
that she did not "completely comply" with Hambright's request,
because other TBE employees, possibly Fileger and Peters, told her
"to disregard it."    (*Id.* at 96.)    According to plaintiff,
Hambright's memo prompted one of the EOPT employees, Bill Delaney,
to resign.   (*Id.* at 94.)

Even with the resignation of Bill Delaney, as well as the
resignation of several other employees working on the EOPT,
budgetary shortages were still of imminent concern.   (Thurston's
affidavit ¶ 7.)  TBE expected the LDCC to be commercially viable by
January 1996, but the EOPT continued to suffer technical set-
backs, and "the development of the LDCC did not appear to be
close."   (*Id.* ¶ 10.)  Accordingly, Thurston met with Hambright and
Yanosky in February 1996, and identified plaintiff, and Jo Knight,

8

a secretary working in the EOPT, as employees occupying positions that could be eliminated. (*Id.* ¶ 11; Yanosky's affidavit ¶ 7; Hambright's affidavit ¶ 5.) Thurston decided to delay issuing the lay-off notices, because

> the technical members of the EOPT were telling me that the LDCC would be developed in time for a trade show in California in June. Therefore, we decided to hold-off on any further lay-offs until after the trade show in June. Plaintiff was working to set-up the booth for this trade show, so we decided to wait and see how the LDCC performed and sold until after the trade show.

(Thurston's affidavit ¶ 12; Hambright's affidavit ¶ 7.)

Meanwhile, Yanosky attempted to find plaintiff a different position within TBE, but in another division of the company. (Yanosky's affidavit ¶ 8; Hambright's affidavit ¶ 6.) Yanosky did locate one opening: a lateral transfer to a marketing position in TBE's Space Programs Division under the supervision of Mike Payne.

(Yanosky's affidavit ¶ 8; plaintiff's deposition at 234.)

Plaintiff interviewed with Mike Payne for the position prior to the trade show in June, but claims that she did not know at the time of the interview that her EOPT marketing position was going to be eliminated.[1] (Plaintiff's deposition 234-35.) Plaintiff

---

[1] After plaintiff was deposed, she submitted an affidavit in support of her motion for summary judgment. (Doc. no. 57.) In her affidavit, however, plaintiff materially alters her version of the story in several aspects. Pertinent to the present discussion, plaintiff avers that her interview with Mike Payne occurred after the trade show in June. (Affidavit at 2.) Because the court concludes that her affidavit is a sham, as that term is defined under

9

attended this interview because "it was obvious to me that [Hambright] and I were not going to work together fluidly." (*Id.* at 234.) According to plaintiff, Mike Payne offered her the job and Hambright "approved for me to go over to take that job." (*Id.* at 235-36.) Hambright wanted plaintiff to remain in the EOPT, however, until after the trade show. (*Id.*)

By the time the trade show occurred, which was held in California in June 1996, the LDCC still was not ready for commercial sale. (Thurston's affidavit ¶ 13; Hambright's affidavit ¶ 8.) Plaintiff, Hambright, and Fileger nevertheless attended the show, because the trip "had been scheduled in advance and the LDCC was still being promised." (Hambright's affidavit ¶ 8.)

On June 3, 1996, plaintiff telephoned Hambright at his hotel from the floor of the trade show. (Plaintiff's deposition at 211.) Plaintiff needed to arrange for his identification badge, so that he could gain entrance to the show the following morning. (*Id.* at 212.) Plaintiff contends the conversation initially was uneventful, but changed after a few minutes. (*Id.* at 212-214.) Hambright invited plaintiff to go to dinner with him that night, but plaintiff declined, stating that she needed to work, and she

binding Eleventh Circuit precedent, *see* discussion *infra* at section III.A, the court refuses to consider this testimony.

10

was not appropriately dressed.     (*Id.* at     216.)     Hambright

persisted, saying that representatives of a prospective customer

would be accompanying them:

> He said their wives were going to dinner with them and that
> I could relax. This was going to be my opportunity to take
> care of me on this trip. I had been working hard. This was
> my opportunity to take care of him. It would be good for
> him to [be] seen with me. It would be good for him to be
> seen with me — with him with a great pair of legs.
> . . .
> He went on to say that, didn't I have kids? And I told
> him, yeah. He was very familiar with the area [around the
> trade show] because he used to work there and that there was
> this exclusive doll place that his ... wife and kid could
> get dolls from that you couldn't really get ... from
> anywhere else. He would take me shopping and that there
> would be plenty of free time.
> . . .
> [W]hen I did get real firm and [told] him no, he took an
> angry tone and told me that — he went back to the loyalty
> thing. He didn't appreciate my loyalty [to Fileger], that
> it wasn't going to — he wasn't going to be able to help
> me. That he didn't want — didn't want me to go back and
> say anything, that he was the boss, that I needed to
> recognize that. And it was going to cost me my job.
> . . .
> He asked me if I drank. And I forget, he said the specific
> name of the drink and I told him no. I do like beer so I
> didn't feel like I lied to him when I said no. He said it
> was a shame because he thought he might get lucky that
> night.

(Plaintiff's deposition at 216-19.) Plaintiff concedes, however,

that Hambright never made any explicit requests for sexual favors,

nor did he ever say "give me sex or you're going to lose your job."

(*Id.* at 219.)

11

After the telephone call, plaintiff immediately went to the registration booth and arranged for Hambright's identification badge. (*Id.* at 223.) Then, plaintiff located Fileger and she "told him everything. ... [A]nd I begged him [not to] tell anybody when we go back home until I [told him] to because I was afraid." (*Id.* at 224.) Fileger reassured plaintiff that she did not have to go to dinner with Hambright, and that Hambright was "not going to do anything or say anything to [her] in front of everybody at the trade show." (*Id.* at 225.) The remaining trip was uneventful, as Hambright did not make any additional offensive comments. (*Id.* at 225-26.)

When plaintiff returned from the trade show on June 10, 1996, Dottie Rutter, Hambright's administrative assistant, notified her that Hambright "called from the show and told her not to approve [plaintiff's] time charges."[2] (*Id.* at 227.) Although plaintiff had previously requested that Fileger not reveal her confidences, she "blurted out what [she] thought of Greg and the reason that [she] thought he was doing it." (*Id.*)

Plaintiff went directly from Rutter's office to her office and called John Gamble, TBE's human resources manager. (*Id.* at 229.)

_____

[2] The court notes that Rutter has submitted an affidavit in which she denies both that the conversation occurred and that Hambright reduced plaintiff's work hours. (Rutter's affidavit ¶ 3.)

12

According to plaintiff, she reported "everything that I could remember from start to finish." *(Id.* at 229.) Plaintiff speculated that the only basis Hambright had for denying her time charges "was in retaliation for me not doing what he requested." *(Id.* at 230.) Gamble reminded her "to be careful when you say things like that." *(Id.)* Gamble also asked her if Hambright had a "legitimate gripe about [her] time charges." *(Id.)*

> He asked me, did you charge on the weekend? I said, yeah, I charged on the weekend. He said, you knew he didn't approve of your time — charging time on the weekend because of his taking issue on that last trip, which was January or February, March time frame.

*(Id.* at 231.) Plaintiff also told Gamble that she "wanted him to look into it. ... And I wanted him to get back with me and let me know what can I do? What are my avenues of recourse? ... I want you to investigate it." *(Id.* at 233.) Gamble encouraged her "to be looking for a place to move to." *(Id.)*[3]

---

[3] For the record, the court notes that Gamble disputes the nature of plaintiff's telephone call. In an affidavit submitted in support of TBE's motion for summary judgment, Gamble avers:

> The first time that Valerie Storey ... ever complained about any inappropriate conduct on the part of Greg Hambright was her last day of work on July 22, 1996. She claims that on June 10, 1996, she mentioned to me that Greg Hambright had sexually harassed her in California. She never made any such complaint. The nature of the conversation on June 10 involved plaintiff accusing Greg Hambright of being a little drunk.

> Before plaintiff's employment ended on July 22, 1996, I did not say anything to Greg Hambright or Bruce Thurston about my conversation

13

Thurston issued plaintiff a reduction in force ("RIF") notice on July 8, 1996, notifying her that her employment would be terminated effective July 22, 1996. (Thurston's affidavit ¶ 13.) When he made the decision to issue plaintiff a RIF notice, he had no knowledge of plaintiff's sexual harassment allegations. (Id.)

Also, plaintiff's transfer to the Space Programs Division never materialized. (Plaintiff's deposition at 236.) Plaintiff is "not exactly" sure why it did not occur, and stated that Mike Payne told her that he did not understand it either. (Id.) Payne told her that he thought he was running the program, but his decision was superseded by someone else. (Id.)

On plaintiff's last day of employment, July 22, 1996, she spoke with Gamble about Hambright's conduct in California. (Gamble's affidavit ¶ 3.) Gamble claims that this is the first conversation in which plaintiff accused Hambright of sexual harassment, and he reported her complaint to his supervisor, John Logan, the Director of Human Resources. (Id.) Logan conducted an investigation into

---

with plaintiff on June 10. Since she never made a complaint of sexual harassment, I would not have reported it to my supervisor or Greg Hambright's supervisor, Bruce Thurston. I reported plaintiff's complaint made on July 22, to my supervisor, John Logan, Director of Human Resources. He conducted the investigation. I do not recall ever mentioning anything about plaintiff's July 22, complaint to Greg Hambright or Bruce Thurston.

(Gamble's affidavit ¶¶ 2-3.)

14

plaintiff's accusation, and reported the results of his investigation to plaintiff after her employment with TBE had ended. (Logan's affidavit ¶ 4.)

The day after plaintiff's discharge, Fileger and five other employees on the EOPT, including all four remaining engineers, resigned *en masse*. (Thurston's affidavit ¶ 14; Hambright's affidavit ¶ 10.) These employees formed a competing company, Gryphon Optical, and TBE obtained a permanent injunction enjoining Gryphon from using LDCC trade secrets and any other materials developed at TBE. *See Teledyne Brown Engineering v. Fileger*, Civil Action No. CV-96-N-2333 (N.D. Ala. Jan. 8, 1997). TBE subsequently dissolved the EOPT. (Hambright's affidavit ¶ 10.)

### III. DISCUSSION

#### A. TBE's Motion to Strike

TBE moves to strike a portion of plaintiff's evidentiary submission filed in opposition to the motion for summary judgment. Specifically, TBE argues that plaintiff's affidavit, submitted on August 25, 1999, is inadmissible because it constitutes a "sham affidavit," as that term is defined by binding precedent. In essence, TBE not only contends that the affidavit testimony directly contradicts plaintiff's earlier deposition testimony, but also that it is based on inadmissible hearsay and speculation.

15

The court agrees.

In this circuit, "a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction." *Rollins v. TechSOUTH, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)). If this occurs, "the court may disregard the affidavit as a sham." *Id.*

A mere discrepancy, however, will not justify a district court's refusal to accept such evidence. See *Tippens v. Celotex Corporation*, 805 F.2d 949, 954 (11th Cir. 1986).

> To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the ... affiant was stating the truth.

*Tippens*, 805 F.2d at 953. Thus, the court must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Rollins*, 833 F.2d at 1530.

Here, plaintiff's deposition is clearly inconsistent with her earlier deposition testimony, and plaintiff has failed to offer any explanation for the discrepancy. Specifically, in her deposition,

16

plaintiff testified that she interviewed for a job in the Space Programs Division <u>before</u> attending the California trade show in June. Moreover, plaintiff voluntarily, spontaneously stated that Hambright approved her transfer.

Q.   <u>[P]rior to June 3rd of '96, had you been on any job interviews at other parts of the company</u>?

A.   <u>Yes</u>.

Q.   What was the purpose of going on those job interviews?

A.   He and I were not — it was obvious to me that [Hambright] and I were not going to work together fluidly.

Q.   Who arranged those job interviews for you?

A.   This one — the one that I'm thinking of Paul Fileger had asked me did — what do you want me to do? I said, help me find some place else to go. He talked to John and that was kind of John's responsibility. He said, put your ear to the ground. And John sent a memo out to his buddies. ... Mike Payne, one of those folks saw it and called me. They were looking for somebody just like me to replace a girl who was going to go full-time to the Mercedes contract when they won it. ...

Q.   <u>At the time of those interviews, did you learn that your job was going to be eliminated</u>?

A.   <u>No</u>. I never thought that my job was going to be eliminated. <u>As a matter of fact, Greg approved for me to go over to take that job</u>. I[t] was necessary [for me] to work this program, [but] that he could let me go part time after the trade show. ...

Q.   Were you ever offered a job?

17

A.     Uh-huh (positive response).  That group did.

Q.     The space group?

A.     Uh-huh (positive response).

Q.     Who offered you that job?

A.     Mike Payne did.  And I actually attended a couple of
       meetings on their behalf.

Q.     Do you know why you were never transferred over
       there?

A.     Not exactly.  I do know that Mike told me that he
       didn't understand it.  He thought that he was running
       the program. ...  I got the impression that Greg had
       something to do with it based on something Greg said
       to me when he handed me my layoff notice.

(Plaintiff's deposition at 234-37 (emphasis supplied).)

     In direct contradiction to her deposition testimony, however,

plaintiff avers in her affidavit that the interview occurred after

her trip to the California trade show, and, that Hambright refused

to let her transfer to the position.  The relevant portions are set

out below:

     Immediately upon my return from the California trade show,
     I reported the incident of sexual harassment to John Gamble,
     who is the Human Resources Manager. ... [John] suggested
     that the best solution was for me to get transferred to
     another job.  As a result of this, I did look for another
     job, was interviewed, and offered another job by Mike Payne.
     This job was almost identical to the one I held.  When I met
     with Greg about this, he said that he understood that this
     would be an opportunity for me, but that he could not let me
     go at the time.

18

(Plaintiff's affidavit (doc. no. 57) at 1-2.)

Because this affidavit testimony does not merely clarify her prior deposition testimony, but directly contradicts it, the court concludes that the affidavit is due to be excluded as a sham. By attempting to place the interview after the trade show in California, plaintiff apparently was attempting to create a causal connection between the alleged harassment and the decision to terminate her employment. Such an issue of fact, however, cannot be created by misrepresentation. Accordingly, TBE's motion to strike is due to, and shall be granted.

## B. TBE's Motion for Summary Judgment

### 1.   Sexual Harassment[4]

---

[4] For clarification purposes, the court notes that plaintiff in defending her claims from summary judgment did not argue that Hambright's conduct amounted to *quid pro quo* sexual harassment. Although her EEOC charge is arguably broad enough to encompass such a claim, (it states that "on June 3, 1996, I was sexually harassed by Greg Hambright, manager" (Logan's affidavit at Exhibit 2)), all parties limit their summary judgment discussion solely to hostile work environment. If plaintiff intended her EEOC charge and her judicial complaint to include a claim of *quid pro quo* harassment, she should have clarified her allegations in response to TBE's motion for summary judgment "on all of plaintiff's claims in her Complaint." (Motion at 1.)

Moreover, such a claim seems inconsistent with plaintiff's allegations in her complaint. In that pleading, she alleges that she was terminated in retaliation for reporting Hambright's conduct, not because she refused to accompany him to dinner. (Complaint ¶ 17.) Specifically, she alleges that "[o]n July 19, 1996, Plaintiff reiterated to the Defendant Company's Human Resources Manager that she believed her position was being terminated in retaliation for her complaints about the discrimination and harassment from the Defendant Hambright." (*Id.*) Accordingly, this court limits its discussion to plaintiff's hostile work environment harassment claim.

Alternatively, plaintiff cannot establish a *prima facie* case of *quid pro*

19

Title VII makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ....

42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court concluded that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Id.* at 64, 106 S.Ct. at 2404 (quoting *Los Angeles Department of Water and Power vs. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978)). Encompassed within that "spectrum" is the right of individuals to work in an environment that is not

---

quo sexual harassment. *Quid pro quo* harassment occurs when an employee's job conditions, privileges or benefits are altered because she refuses to submit to an employer's sexual demands. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 105 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To establish a prima facie case, plaintiff must prove the following four elements: (1) that she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; and (4) her reaction to the harassment complained of affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment. *Henson v. Dundee*, 682 F.2d 897, 908 (11th Cir. 1982). Here, plaintiff cannot prove the fourth element, namely that her refusal to accompany Hambright to dinner resulted in the loss of her job. Specifially, TBE has produced evidence that plaintiff was terminated as a result of a reduction in force, and due to budgetary shortages in the EOPT. Moreover, TBE has also produced evidence that Thurston, not Hambright, made the decision to issue plaintiff a RIF notice, and that such decision was made prior to the trade show incident. Plaintiff offers nothing but mere speculation to prove that Hambright was responsible for the elimination of her employment and, accordingly, she has failed to meet her prima facie burdens.

20

discriminatorily hostile or abusive. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). According to the *Harris* court:

> When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Title VII is violated.

*Id.* at 21, 114 S.Ct. at 370 (quoting *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405) (internal citations omitted).

The Eleventh Circuit recently summarized the elements a plaintiff must allege to state a claim for gender discrimination based on a sexually hostile work environment:

> (1) the employee must belong to a protected group; (2) the employee must have been subject to unwelcome sexual harassment; (3) the harassment must have been based on sex; (4) the harassment must have been sufficiently severe or pervasive to alter the conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment either directly or indirectly.

*Mendoza v. Borden, Inc.*, 158 F.3d 1171, 1175 (11th Cir. 1998) (emphasis supplied). The Supreme Court reiterated in *Harris* that Title VII liability for a sexually hostile work environment "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

21

A plaintiff must show not only that she <u>subjectively perceived</u>
her work environment to be hostile, but also that the conduct
creating this environment was sufficiently severe or pervasive to
make her perception <u>objectively reasonable</u>:

> Conduct that is not severe or pervasive enough to create
> an objectively hostile or abusive work environment—an
> environment that a reasonable person would find hostile
> or abusive—is beyond Title VII's purview. Likewise, if
> the victim does not subjectively perceive the environment
> to be abusive, the conduct has not actually altered the
> conditions of the victim's employment, and there is no
> Title VII violation.

*Id.* at 21-22, 114 S.Ct. at 370. The *Harris* court also pinpointed
a number of factors, none of which are dispositive, that aid in
determining whether a work environment is hostile to the extent
that Title VII is violated:

> These may include the <u>frequency</u> of the discriminatory
> conduct; its <u>severity</u>; whether it is <u>physically</u>
> <u>threatening or humiliating, or a mere offensive</u>
> <u>utterance</u>, and whether it <u>unreasonably interferes with an</u>
> <u>employee's work performance</u>.

*Id.* at 23, 114 S.Ct. at 371 (emphasis supplied) (concluding that
whether a work environment is hostile depends on an analysis of
"all the circumstances"). According to the Eleventh Circuit in
*Mendoza,* "'[a] hostile environment claim is a single cause of
action rather than a sum total of a number of mutually distinct
causes of action to be judged each on its own merits ....'"

22

*Mendoza*, 158 F.3d at 1176 (quoting *Vance v. Southern Bell Telephone & Telegraph Company*, 863 F.2d 1503, 1510-11 (11th Cir. 1989)).

Here, plaintiff's claim fails because she has not shown that any harassment to which she was subjected was sufficiently "severe or pervasive ... to alter the terms and conditions of employment." *Mendoza*, 158 F.3d at 1175. Rather, plaintiff's complaint focuses on a single, isolated incident of "merely offensive" conduct, which is not actionable under Title VII. *See Harris*, 510 U.S. at 21, 114 S.Ct. at 370. "Title VII does not attempt 'to purge the workplace of vulgarity ....'" *Hopkins v. Baltimore Gas and Electric Company*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Baskerville v. Culligan International Company*, 50 F.3d 428, 430 (7th Cir. 1995)). When enacting Title VII, Congress did not "expect employers to purify the language in the workplace or remove all vulgarity or coarse comments." *Johnson v. Hondo, Inc.*, 940 F. Supp. 1403, 1410 (E.D. Wis. 1996).

Specifically, Hambright's conduct is not sufficiently pervasive as a matter of law, because it only occurred as an isolated incident, during the California trade show. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (noting that "off hand comments" and "isolated

23

incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment"); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987) (to be deemed pervasive, the conduct must be more than episodic; it must be sufficiently continuous and concerted), *overruled on other grounds by Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989).

Moreover, the evidence does not demonstrate that the conduct of which plaintiff complains was sufficiently "severe" to warrant liability under Title VII. Plaintiff alleges that Hambright made the following offensive comments: that she had "a great pair of legs"; that he "might get lucky" that night; and that this was her opportunity to take care of herself. (Plaintiff's deposition at 216-219.) These comments lack the numerosity, intensity, and "shock value" elements recognized by the Eleventh Circuit as indicative of a hostile work environment. *See, e.g., Mendoza*, 158 F.3d at 1175-76 (supervisor stared at plaintiff constantly; looked her up and down in a sexually suggestive manner; stared at her groin area while making sniffing sounds; and rubbed his hip against hers, while touching plaintiff's shoulders); *see also, e.g., Equal Employment Opportunity Commission v. Beverage Canners*, 897 F.2d

24

1067, 1068 n.3 (11th Cir. 1990).[5]

In sum, this court finds, based on the factors delineated by the
Supreme Court in *Harris*, that plaintiff has failed to show that a
reasonable person would deem the conduct of which she complains
sufficiently severe or pervasive to constitute a sexually hostile
working environment.    Accordingly, this claim is due to be
dismissed.

**B. Retaliation**

Title VII also prohibits discrimination based on an employee's
decision to pursue legally-protected rights.    According to 42
U.S.C. § 2000e-3(a):

---

[5] In *Beverage Canners*, the Eleventh Circuit affirmed the trial court's
finding of a racially hostile work environment based on the following facts:

> [The plant manager] and Bennett Achins, a supervisor at the plant,
> frequently made flagrant, revolting, and insulting racially
> derogatory remarks towards and in the presence of blacks.

. . .

> [The plant manager] used such language as: "niggers," "ignorant
> niggers," and "swahilis." The record also shows that Windholtz said
> "blacks were meant to be slaves" and were of lower intelligence. He
> proclaimed that "[t]hose niggers out there will not get anywhere in
> this company."

. . .

> We uphold the trial court's findings that "the numerous racial
> epithets were not made sporadically, accidentally, or as part of a
> casual conversation" and that management was informed but did
> nothing to correct the situation.

*Beverage Canners*, 897 F.2d at 1068, n.3, 1070.

25

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his employees ...
> because he has opposed any practice made an unlawful
> employment practice by this subchapter [*the opposition
> clause*], or because he has made a charge, testified,
> assisted, or participated in any manner in an
> investigation, proceeding, or hearing under this
> subchapter [*the participation clause*]. [Emphasis
> supplied.]

To establish a *prima facie* case of retaliation under either the
opposition or the participation clause of § 2000e-3(a), a plaintiff
must show three things: (1) statutorily protected expression or
activity; (2) an adverse employment action; and (3) a causal
linkage between the protected conduct and the adverse action. *See*,
*e.g.*, *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.
1993) (outlining Title VII retaliatory discharge framework).

When the retaliation claim is based, as here, upon the
opposition clause of § 2000e-3(a), however, the Eleventh Circuit
requires a plaintiff to demonstrate that any acts committed, or
statements made, when protesting an allegedly unlawful employment
practice were both subjectively and objectively reasonable;
otherwise, as a matter of law, the acts or statements will not be
deemed "statutorily protected."

> A plaintiff engages in 'statutorily protected activity'
> when he or she protests an employer's conduct which is
> actually lawful, so long as he or she demonstrates "a
> good faith, reasonable belief that the employer was

26

> engaged in unlawful employment practices." *Little v.
> United Technologies, Carrier Transicold Division,* 103
> F.3d 956, 960 (11th Cir. 1997). However, it is
> insufficient for a plaintiff "to allege his belief in
> this regard was honest and bona fide; the allegations and
> record must also indicate that the belief, though perhaps
> mistaken, was objectively reasonable." *Id.*

*Harper v. Blockbuster Entertainment Corporation,* 139 F.3d 1385,

1388 (11th Cir. 1998) (emphasis supplied).[6]

The dispositive question here concerns whether plaintiff's

belief — even if it was "honest and bona fide" — was "objectively

reasonable." This court concludes it was not. A reasonable person

would not consider the conduct of which plaintiff complained to

have been unlawful under Title VII.

This conclusion comports with the facts described above, as well

as the substantive law on record at the time plaintiff filed her

claim. *See Clover v. Total System Services, Inc.,* 176 F.3d 1346,

1351 (11th Cir. 1999) ("The objective reasonableness of an

---

[6] In *Little,* the Eleventh Circuit elaborated on the policy behind this
test:

> A plaintiff, therefore, need not prove the underlying discriminatory
> conduct that he opposed was actually unlawful in order to establish
> a *prima facie* case and overcome a motion for summary judgment; such
> a requirement "[w]ould not only chill the legitimate assertion of
> employee rights under Title VII but would tend to force employees to
> file formal charges rather than seek conciliation of informal
> adjustment of grievances."

*Little,* 103 F.3d at 960 (quoting *Sias v. City Demonstration Agency,* 588 F.2d 692,
695 (9th Cir. 1978)). *Accord Bigge v. Albertsons, Inc.,* 894 F.2d 1497, 1501
(11th Cir. 1990).

27

employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.") Again, the substance of plaintiff's complaint focuses on several remarks made by Hambright during a single telephone conversation. Binding precedent makes it undoubtedly clear that such allegedly discriminatory conduct was neither sufficiently severe nor pervasive to create a hostile work environment in violation of Title VII. *See* discussion *supra* in section III.B(1).

Thus, because plaintiff cannot prove that her belief was objectively reasonable, plaintiff has failed to establish that she engaged in statutorily protected expression or activity. Therefore, she cannot make out a *prima facie* case of unlawful retaliation under the opposition clause of 42 U.S.C. § 2000e-3(a).

## IV. CONCLUSION

Based on the foregoing, the court finds that TBE's motions for summary judgment and to strike are due to be granted, and plaintiff's claims are due to be dismissed in their entirety. An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this __7th__ day of February, 2000.

United States District Judge

28